[Cite as *State v. Gosha*, 2011-Ohio-2278.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 95290

STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

KEVIN SHAWN GOSHA

DEFENDANT-APPELLANT

JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-525493

BEFORE: Kilbane, A.J., Stewart, J., and Boyle, J.

RELEASED AND JOURNALIZED:   May 12, 2011

ATTORNEY FOR APPELLANT

David L. Doughten
The Brownhoist Building
4403 St. Clair Avenue
Cleveland, Ohio 44103

ATTORNEYS FOR APPELLEE

William D. Mason
Cuyahoga County Prosecutor
Scott Zarzycki
Steven N. Szelagiewicz
Assistant County Prosecutors
The Justice Center - 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, A.J.:

{¶ 1}   Defendant-appellant,   Kevin Shawn Gosha, appeals from his convictions for aggravated robbery and tampering with evidence.   For the reasons set forth below, we affirm.

{¶ 2}   On June 18, 2009, defendant and codefendant, Arthur Smith (Smith),   were indicted in connection with the shooting death of Darnell Mongo (Mongo).   Count 1 charged

defendant with aggravated murder by prior calculation and design. Count 2 charged him with aggravated murder in the course of an aggravated robbery. These counts also set forth felony murder specifications, one- and three-year firearm specifications, notice of prior conviction for a 2003 aggravated robbery conviction, and repeat violent offender specifications. Count 3 charged him with aggravated robbery with one- and three-year firearm specifications, notice of prior conviction, and repeat violent offender specifications. Count 4 charged him with tampering with evidence with one- and three-year firearm specifications. Count 6[1] charged him with having a weapon while under disability.

{¶ 3} Smith subsequently pled guilty to voluntary manslaughter and having a weapon while under disability.

{¶ 4} Defendant pled not guilty. On January 11, 2010, the State moved to dismiss the felony murder specifications for Counts 1 and 2, thus eliminating the death penalty as a potential sentence. On May 3, 2010, defendant waived his right to a jury trial on the charges of tampering with evidence, having a weapon while under disability, notice of prior conviction, and repeat violent offender specifications on Counts 1 through 3.

{¶ 5} Jury trial on the aggravated murder charges and the charge of aggravated robbery commenced on May 6, 2010. The jury subsequently acquitted defendant of aggravated murder and the lesser included offense of murder, under Counts 1 and 2. The

---

[1]Count 5 charged Smith with having a weapon while under disability, but did not set forth any charges against Gosha.

jury found defendant guilty of aggravated robbery, but not guilty of the firearm specifications as alleged in Count 3. Thereafter, the trial court found defendant guilty of the notice of prior conviction and dismissed the repeat violent offender specification for this count, guilty of tampering with evidence under Count 4, and not guilty of having a weapon while under disability under Count 6. The trial court then sentenced defendant to ten years of imprisonment on the aggravated robbery conviction, a consecutive term of four years of imprisonment on the conviction for having a weapon while under disability, and five years of mandatory postrelease control.

{¶ 6} The State presented testimony from Robert Smith, Terrell Bilal, Terrance Bilal, Special Agent Daniel Winterich (Agent Winterich) of the Ohio Bureau of Criminal Identification and Investigation (BCI), East Cleveland Police Sergeant John Bechtel (Sergeant Bechtel), codefendant Smith, Creola Rice, Trace Evidence Specialist Curtiss Jones, Michelle Smith (Michelle), Coroner Frank Miller, East Cleveland Police Detective Scott Gardner (Detective Gardner), Cuyahoga County Clerk of Courts Administrative Officer Brent Bartel, and Donald Andree of the Cuyahoga County Sheriff's Identification Unit.

{¶ 7} Robert Smith testified that he lives on Northfield Avenue near Chapman Avenue in East Cleveland. During the early morning hours of May 21, 2009, he went to the area of Northfield and Potomac Avenues, a short distance from his home, in order to make a drug buy. He then heard an argument taking place in the middle of the street on Northfield

Avenue, at the adjacent corner. After that, he heard a gunshot. A couple of minutes later, he saw a van proceeding down Northfield Avenue and collide into a concrete overpass. He then heard more gunshots, so he hid in nearby bushes.

{¶ 8} After a few moments he heard more people on the scene. He approached the van and observed Terrell Bilal (Terrell) and Terrance Bilal (Terrance) attempting to help the driver.

{¶ 9} Terrell testified that he lives in an apartment near the intersection of Elderwood and Northfield Avenues in East Cleveland. With regard to the instant matter, Terrell testified that he was in his apartment when he heard three or four gunshots. Terrell looked out his window and saw a tall man walking. This man walked to a nearby "whitish/bluish" car. Terrell went outside to check on his younger brother, Terrance, then walked over to Northfield Avenue, where he observed a van that had crashed into the side of an overpass, on the side of oncoming traffic. Terrell instructed Terrance to call the police.

{¶ 10} Terrell looked inside the van and attempted to open the front passenger door. The door would not open so he reached into the partially opened window and opened the door from the inside. The driver's upper body was slumped in the front passenger seat, and the rest of his body was behind the wheel in the driver's seat. Terrance entered the side door of the van. The men began to speak to the driver, later identified as Mongo, but he was

unresponsive and shaking. Blood was coming through the seat and running through to the back of the van, but the men could not determine the location of his injuries.

{¶ 11} Terrell took the driver's cell phone and called the last number that had been dialed. A female answered, and Terrell told her that the man who was in the van was hurt. Robert Smith and another unidentified man arrived, followed by the female Terrell had called on the cell phone.

{¶ 12} Terrance testified that he lives in the apartment next door to Terrell near the intersection of Elderwood and Northfield Avenues. Terrance stated that he heard gunshots, the screech of tires, and the sound of a vehicle crashing. After the crash, he heard three more gunshots.

{¶ 13} Terrance looked out his window and observed a tall, skinny guy walking away from a nearby van. According to Terrance, the man stood in the middle of the intersection of Northfield and Elderwood Avenues. Terrance called out to the man in the street to see if the man was okay, but the man did not respond. A car pulled over toward the man and he entered the vehicle. He and the driver of this vehicle stayed there for a short time. They looked over at Terrance, and then turned around and proceeded on Elderwood Avenue. They then dropped the tall, skinny man off at a parked vehicle.

{¶ 14} Terrell reached the van first and instructed Terrance to call the police. They then got into the van to check on the driver. Another neighbor whose nickname is "Dirty" arrived to help. The driver of the van was incoherent, and blood was pooling on the floor.

{¶ 15} On cross-examination, Terrance admitted that he has been convicted of felonious assault and abduction.

{¶ 16} Agent Winterich testified that he processed a green GMC van, the crime scene in this matter. The driver's side door would not open because of the damage sustained in the crash, there were two bullet holes in the front windshield near the driver's side, and there was a rust hole in a portion of the floor board. The interior of the van had extensive blood stains, and a large volume of blood was pooled toward the back of the van and also seeped outside. Lawn equipment and tools were in the back of the van.

{¶ 17} According to Agent Winterich, one bullet hole was found on the windshield just above the wiper, and the other bullet hole was in the area where the windshield meets the hood. Agent Winterich determined that the shots were fired at 86 degrees and 88.3 degrees, or were, essentially, straight on shots at the driver. One of the bullets fragmented after it struck the frame of the car, and the other became lodged in insulation behind the instrument panel. Neither bullet, therefore, struck Mongo.

{¶ 18} Agent Winterich also observed a receipt for allergy medicine purchased at CVS on May 21, 2009, at 1:26 a.m. He obtained latent fingerprints from inside the van but there was not enough ridge detail to conduct an analysis.

{¶ 19} On cross-examination, Agent Winterich stated that he could not determine whether the shooter was inside or outside the van, but he denied telling officers on the scene that the fatal shot was fired into the van from the front of the vehicle.

{¶ 20} Sergeant Bechtel testified that he responded to the call for police assistance. Although the initial call to the police indicated that the driver had been involved in a motor vehicle accident, the officers at the scene determined that the driver had been shot. Sergeant Bechtel helped remove the man from the van and place him on a gurney. The man struggled to get off of the gurney but was uncommunicative.

{¶ 21} Sergeant Bechtel and other officers observed a bullet hole at the base of the windshield. About 500 feet away from the scene of the crash, the officers observed a puddle of blood and a blood trail leading back toward the underpass where the van had crashed. The officers photographed the blood stains, but they did not do blood typing.

{¶ 22} Codefendant Smith testified that he pled guilty to charges of involuntary manslaughter[2] and having a weapon while under disability in connection with this matter.

---

[2] The record indicates that Smith actually pled guilty to voluntary manslaughter and having a weapon while under disability. See *State v. Smith,* Cuyahoga Common Pleas Case No. CR-525493-B.

He was given a sentence of 15 years of imprisonment, and as part of his plea agreement, he was required to testify against defendant.

{¶ 23} Smith testified that he and defendant were friends and that they often used crack cocaine together. On May 20, 2009, Smith got a room at McCall's Motor Inn and he, defendant, Smith's girlfriend (Michelle), and another woman named Rochelle went there to drink and use drugs. Defendant later left this party and, during the early morning hours of May 21, 2009, Smith asked defendant to pick him up and take him to purchase a wholesale quantity of drugs, which Smith intended to then resell.

{¶ 24} The men decided to contact defendant's friend, Mongo. According to Smith, however, the defendant owed Mongo money, so Smith called to setup the sale approximately four blocks away from McCall's Motor Inn.

{¶ 25} The defendant drove Smith to this location, spotted Mongo's van, and parked behind the van. Defendant then entered the van, while Smith waited in defendant's car with a handgun. Smith heard defendant and Mongo arguing. Defendant then put his right hand out of the passenger window and motioned for the gun. Smith approached the men inside the van and asked them what was happening. Mongo then gave Smith a package of drugs that Smith believed was less than the amount he had purchased. Smith then handed the gun to defendant. The defendant then grabbed additional drugs that Mongo had in his

hand, and shot Mongo in his lower body. Smith took the gun back and asked defendant what he had done, then fled back to McCall's Motor Inn.

{¶ 26} As Smith was running, he saw Mongo's van heading directly toward him. Smith started shooting at the van. The van subsequently crashed into the wall of an overpass. Smith spotted the defendant driving near Euclid Avenue and got into defendant's car. Smith asked the defendant to drive back to the inn, but the defendant was afraid to return there. Defendant then drove Smith to "Smitty's," Michelle's father's house, on Rozelle Avenue.

{¶ 27} After they arrived at Smitty's, defendant and Smitty returned to the inn to pick up the women, while Smith disassembled the gun. Smith explained that he was "getting rid of what needed to be get rid of." Defendant and Smitty then returned to Rozelle Avenue with the women. Later, Smith, Michelle, Rochelle, and defendant drove to St. Clair Avenue, to the home of one of defendant's friends and continued partying. While en route, defendant drove and Smith threw the pieces of the disassembled gun out of the car window.

{¶ 28} Smith further testified that defendant drove the group to the El Dorado Hotel. Defendant subsequently learned that Mongo had died. Smith learned that the police were looking for him, so he turned himself in at the East Cleveland police station. He provided the police with a statement in which he indicated that they arranged to meet with Mongo in order to buy drugs, that defendant drove a Vibe sport utility vehicle, that defendant made the

purchase inside Mongo's van, and that Smith then passed his weapon to defendant. He stated that he dismantled the gun and, while the group traveled from Rozelle Avenue to St. Clair Avenue, he threw the pieces of the gun out of the car window. Smith also stated that as he fled, Mongo's van proceeded directly at him, and he fired at the van.

{¶ 29} On cross-examination, Smith admitted that he has prior convictions for robbery, carrying a concealed weapon, drug possession, and having a weapon while under disability. He admitted that after the defendant passed the money to Mongo, Mongo gave defendant five rocks of crack. Defendant and Smith stated that Mongo had shorted them, and explained to Smith and defendant that they had received less than expected because defendant owed him money. Smith objected that this involved his money, and the defendant and Mongo began to argue. Smith also admitted that he initially told the police that he never got out of the Vibe during defendant's meeting with Mongo. He also admitted that he told Michelle that he had shot Mongo after Mongo tried to rob him.

{¶ 30} Smith also stated, on cross-examination, that he told the police he had disassembled the gun while en route to the house on St. Clair Avenue, and that his previous testimony on direct examination regarding dismantling the gun while alone on Rozelle Avenue was incorrect.

{¶ 31} Creola Rice, defendant's former girlfriend, testified that she used to own a Pontiac Vibe. She further established that defendant had her car for a two-day period around May 21, 2009.

{¶ 32} Tamika Compton testified that she and Mongo have a child. Although Mongo cleaned houses and was attempting to start a record label, he also sold drugs. Mongo only sold to regular customers or friends of his customers. According to Compton, defendant was one of Mongo's customers. A short time before the shooting, defendant falsely told her that Mongo said he could get some drugs on credit. As a result, he obtained $75 in drugs, which he never paid for.

{¶ 33} On May 21, 2009, at about 1:20 a.m., Compton drove her van to CVS to get allergy medicine for Mongo. She gave Mongo the medicine, and the two arranged to work on her yard the following day. Mongo then left in Compton's van.

{¶ 34} Curtiss Jones of the Trace Evidence Department of the Coroner's Office testified that gunshot primer residue samples were obtained from both of Mongo's hands. Trace metal testing was also done, but yielded no reaction. Bullet defects from the entrance and exit of the bullet or bullets were found on Mongo's pants. Gunshot residue was also found on his clothing, but no fouling, thus indicating that the weapon was within the range of one to two feet away from Mongo at the time of discharge.

{¶ 35} He admitted on cross-examination that it was possible that a defect on the pants could have been caused by another bullet.

{¶ 36} Michelle testified that she, Smith, and Rochelle had been celebrating Smith's birthday at McCall's Motor Inn. Smith then left, but he returned later with Michelle's father and defendant, who was driving a Vibe. Defendant drove the group to Michelle's aunt's house on Rozelle Avenue. They remained there for about 30 minutes, then went to a drug house on St. Clair Avenue. They remained at this location until about 1:00 a.m., then went to the El Dorado Hotel in Euclid.

{¶ 37} On cross-examination, Michelle stated that she told the police that Smith had told her that when they went to get more drugs the man tried to rob him, that he shot the man in self-defense, and then fled into some nearby bushes. She also admitted that Smith carried a "cowboy gun," and that she had visited Smith numerous times while he was in jail. During those visits, Smith never indicated to her that defendant was the actual shooter.

{¶ 38} Frank Miller, M.D. testified that he reviewed the autopsy performed in this matter. Mongo sustained a gunshot wound to his right leg above the knee cap. There was also a red abrasion under the right knee. The bullet entered the front of the knee and exited the rear of the knee. It lacerated the popliteal artery, causing Mongo to bleed to death.

{¶ 39} East Cleveland Police Detective Charles Battle (Detective Battle) testified that he followed a trail of blood from the van from Potomac Avenue to Allegheny Avenue to

Northfield Avenue, where they found a small pool of blood. Blood typing was not performed, however. Detective Battle also testified that he reviewed Mongo's phone records and learned that Mongo had called Smith and a residence in East Cleveland shortly before his death. Other calls included calls to Michelle and to McCall's Motor Inn.

{¶ 40} East Cleveland Detective Scott Gardner (Detective Gardner) testified that blood was dripping from the interior of the van to the exterior, and blood continued to drip even after the van was towed to a police garage for processing. Detective Gardner also testified that after the police learned that Mongo had called Smith, they obtained Smith's phone records and through a "reverse check," obtained the telephone number of defendant's girlfriend, Creola Rice. Using that information, he obtained her address and vehicle information, as well as defendant's phone number.

{¶ 41} Detective Gardner subsequently obtained the registration form for the room at McCall's Motor Inn, in addition to a surveillance video from the El Dorado Hotel showing defendant and Smith.

{¶ 42} The jury subsequently acquitted defendant of aggravated murder and the lesser included offense of murder, under Counts 1 and 2. The jury found defendant guilty of aggravated robbery, but not guilty of the firearm specifications as alleged in Count 3.

{¶ 43} On May 12, 2010, the remaining counts and remaining specifications proceeded to trial to the court. At this time, the State incorporated its earlier testimony and also presented the testimony of Brent Bartel and Donald Andree.

{¶ 44} Bartel testified that, as an administrative officer for the criminal division of the Cuyahoga County Clerk of Courts, his job included maintaining records of motions, journal entries, and other filings in criminal matters. In this matter, he produced records in Case Nos. CR-424739 and CR-434472. He identified certified copies of defendant's guilty plea and his sentence in those matters. In Case No. CR-424739, defendant was convicted of, and served time for, robbery. In Case No. CR-434472, defendant was also convicted of, and served time for, robbery.

{¶ 45} Andree testified that he is a Cuyahoga County deputy sheriff and works in the identification unit. He further testified that the primary function of the identification unit is to identify through fingerprints all persons that are in the Cuyahoga County jail. Andree identified fingerprint cards dated May 8, 2002, with sheriff's number 167262, in the name of Kevin Gosha. He also identified fingerprint cards dated December 16, 2002, with sheriff's number 167262, in the name of Kevin Gosha, as well as a fingerprint card in the name of Kevin Gosha dated June 17, 2009, and a fingerprint card taken of defendant at the time of his arraignment. Andree was then qualified as an expert in fingerprint analysis. He testified

that the prints on the fingerprint cards are identical to the fingerprints taken from defendant at the time of his arraignment.

{¶ 46} The trial court found defendant guilty of the notice of prior conviction and dismissed the repeat violent offender specification for this count. The court found defendant guilty of tampering with evidence under Count 4, but not guilty of having a weapon while under disability under Count 6. The trial court then sentenced defendant to ten years of imprisonment on the aggravated robbery conviction, a consecutive term of four years of imprisonment on the conviction for tampering with evidence, and five years of mandatory postrelease control.

{¶ 47} Defendant now appeals and assigns three errors for our review.

{¶ 48} Defendant's first assignment of error states:

**"The evidence is insufficient to sustain a conviction of tampering with evidence, R.C. 2921.12."**

{¶ 49} Within this assignment of error, defendant asserts that pursuant to *State v. Spears*, 178 Ohio App.3d 580, 2008-Ohio-5181, 899 N.E.2d 188, his conviction for tampering with evidence was plain error because there was no evidence that he assisted Smith in disposing of the weapon after the shooting.

{¶ 50} Sufficiency is the legal standard that is applied to determine whether the case may go to the jury or whether the evidence is adequate to support the jury verdict as a matter

of law. *State v. Thompkins,* 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. When reviewing the sufficiency of the evidence to support a criminal conviction,

> **"[a]n appellate court's function * * * is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.**

{¶ 51} R.C. 2921.12(A)(1) provides the essential elements of tampering with evidence as follows:

> **"No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."**

{¶ 52} In *Spears*, the court found that the defendant's conviction for tampering with evidence was plain error when the conviction was based solely on the absence of a weapon at the scene of a shooting and the defendant's own statements that he "threw the gun away."

{¶ 53} However, in *State v. Suggs*, Butler App. Nos. CA2008-02-052 and CA2008-02-053, 2009-Ohio-95, the State presented evidence that the defendant's reason for throwing the gun was to stop the police from using it as evidence against him. On that record, the court of appeals determined that the conviction for tampering with evidence was supported by sufficient evidence. Id., citing *State v. Mann*, Clermont App. No.

CA2006-05-035, 2007-Ohio-1555 (affirming the defendant's conviction for tampering with evidence where he threw a gun out of the car after police began pursuing him to investigate an assault report); *State v. Rinehart*, Ross App. No. 07CA2983, 2008-Ohio-5770 (affirming conviction for tampering with evidence where the defendant threw a gun out of a window during a police pursuit even when his reason for doing so was that the driver told him to do it and he was afraid of getting shot if the police found him in possession of the gun); and *State v. Lytle* (Aug. 19, 1988), Highland App. No. 632 (affirming conviction for tampering with evidence where the defendant threw a gun out of his car window and a third party located the gun because it was so displaced that police were unable to locate it during an initial search).

**{¶ 54}** Therefore, the key is whether the State has presented evidence that the defendant disposed of the gun from the van with the purpose to impair its value or its availability as evidence. *State v. Sims*, Clark App. No. 2008 CA 92, 2009-Ohio-5875.

**{¶ 55}** In this matter, the State maintained that defendant tampered with evidence by aiding and abetting in disposing of the weapon.

**{¶ 56}** R.C. 2923.03(A)(2), Ohio's complicity statute, states that "no person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * Aid or abet another in committing the offense."

**{¶ 57}** To support a conviction for complicity by aiding and abetting, the evidence must demonstrate "that the accused supported, assisted, encouraged, cooperated with, advised,

or incited the principal in the commission of the crime, and that the accused shared the criminal intent of the principal." *State v. Mota*, Warren App. No. CA2007-06-082, 2008-Ohio-4163.

{¶ 58} A charge of tampering with evidence may be established from evidence that the defendant aided and abetted another in altering, destroying, concealing, or removing an object with purpose to impair its value or availability as evidence in such proceeding or investigation. *State v. Mitchum* (Mar. 30, 1984), Gallia App. No. 82CA12; *State v. Greene*, Summit App. No. 21795, 2004-Ohio-3944.

{¶ 59} In *Greene*, the court held that driving the getaway car during the commission of an offense serves as the proper basis for a conviction of aiding and abetting the commission of an offense. The court affirmed a conviction for tampering with evidence where the record demonstrated that defendant drove the getaway car, while the codefendant threw evidence from the car.

{¶ 60} In this matter, Smith testified that after the shooting, defendant and Michelle's father returned to McCall's Motor Inn to pick up the women, while Smith disassembled the gun. Smith explained that he was "getting rid of what needed to be get rid of." Defendant and Michelle's father then returned to Rozelle Avenue with the women. Later, Smith, Michelle, Rochelle, and defendant drove to St. Clair Avenue, to the home of defendant's friend, and continued partying. While en route, defendant drove and Smith threw the pieces

of the disassembled gun out of the car window.    On cross-examination, Smith acknowledged that he told police that he had disassembled the gun while with defendant en route to the St. Clair house, then threw the pieces from the car.    He admitted that his previous testimony on direct examination was incorrect.    Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that defendant    aided and abetted in the tampering with evidence.    The record contains evidence that defendant drove while Smith was "getting rid of what needed to be get rid of," i.e., disassembled the weapon used in the shooting and discarded the pieces out of the window in order to destroy, conceal, or remove the weapon with purpose to impair its availability as evidence in any subsequent investigation or court proceeding.

{¶ 61} The first assignment of error is without merit and overruled.

{¶ 62} Defendant's second assignment of error states:

**"The convictions of aggravated robbery and tampering with evidence are against the weight of the evidence."**

{¶ 63} In determining whether a conviction is against the manifest weight of the evidence,    the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony.    *Thompkins* at 387, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.    The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury "clearly lost its

way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.

{¶ 64} The appellate court may not merely substitute its view for that of the jury, and reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." Id., quoting *Martin*.

{¶ 65} In this matter, after examining the entire record, weighing the evidence and all reasonable inferences, we are unable to conclude that the finder of fact clearly lost its way and created such a manifest miscarriage of justice in convicting defendant of the offenses. The evidence demonstrated that in attempting or committing a theft offense, defendant obtained Smith's gun, and then took the drugs from Mongo's hands. The evidence further demonstrated that defendant later drove Smith, Michelle, and Rochelle from the house on Rozelle Avenue to the house on St. Clair, and at this time Smith was "getting rid of what needed to be get rid of." He disassembled the gun, and threw the pieces of the gun out of the car window.

{¶ 66} The convictions for aggravated robbery and tampering with evidence are not against the manifest weight of the evidence.

{¶ 67} The second assignment of error is without merit and overruled.

{¶ 68} Defendant's third assignment of error states:

"The trial court erred by sentencing the appellant to consecutive sentences without making a record of its findings as required by R.C. 2929.14(E)."

{¶ 69} In *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, the Ohio Supreme Court held that trial courts were no longer required to make findings when "imposing maximum, consecutive, or more than the minimum sentences." The *Foster* court then severed these provisions from the Ohio Revised Code. Defendant asserts, however, that the United States Supreme Court's decision in *Oregon v. Ice* (2009), 555 U.S. 160, 129 S.Ct. 711, 172 L.Ed.2d 517, abrogates that portion of *Foster*.

{¶ 70} In *State v. Hodge*, 128 Ohio St.3d 1, 2010-Ohio-6320, 941 N.E.2d 768, the Ohio Supreme Court rejected the argument that the decision in *Ice* automatically and retroactively reinstates the consecutive-sentencing statutes that were excised in *Foster*. The court stated:

> "[T]he decision of the United States Supreme Court in [*Ice*] does not revive Ohio's former consecutive-sentencing statutory provisions, R.C. 2929.14(E)(4) and 2929.41(A), which were held unconstitutional in [*Foster*]. Because the statutory provisions are not revived, trial court judges are not obligated to engage in judicial fact-finding prior to imposing consecutive sentences unless the General Assembly enacts new legislation requiring that findings be made.
>
> The trial court in this case did not err in imposing consecutive sentences without applying R.C. 2929.14(E)(4) and 2929.41(A)[.]" Accord *State v. Reed*, Cuyahoga App. No. 91767, 2009-Ohio-2264.

{¶ 71} Moreover, following our review of the record, we are unable to conclude that the trial court erred in imposing consecutive sentences herein. The sentence is within the

permissible statutory range for the counts for which he was convicted, the sentence is not clearly and convincingly contrary to law, and the trial court did not abuse its discretion in applying the factors set forth in R.C. 2929.11 and 2929.12. In addition, the court stated at the sentencing hearing and in its sentencing entry that it considered the purposes and principles of sentencing in R.C. 2929.11 and the seriousness and recidivism factors in R.C. 2929.12.

{¶ 72} The third assignment of error is without merit and overruled.

Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____
MARY EILEEN KILBANE, ADMINISTRATIVE JUDGE

MELODY J. STEWART, J., and
MARY J. BOYLE, J., CONCUR